CITY OF BROOKLYN CENTER AND OTHERS v.
METROPOLITAN COUNCIL AND OTHERS.
VILLAGE OF AFTON AND OTHERS,
INVOLUNTARY DEFENDANTS.

243 N. W. 2d 102.

December 12, 1975—Nos. 44888, 45195.

310

*Schieffer, Hadley, Bakke & Jensen* and *Richard J. Schieffer,* for appellants.

*Dorsey, Marquart, Windhorst, West & Halladay, Thomas S. Hay,* and *John D. Levine,* for respondents.

SHERAN, CHIEF JUSTICE.

Appeals from a judgment and an intermediate order entered in a declaratory judgment proceeding brought to determine the statutory validity of a formula adopted by the Metropolitan Sewer Service Board (Board) [1] and approved by the Metropolitan Council (Council) [2] for the allocation and collection of debt service costs for the unused capacity of treatment works and interceptors in the metropolitan sewage disposal system. Affirmed in part; reversed in part.[3]

Reacting to a recognized need for coordinating local governmental operations in the St. Paul-Minneapolis metropolitan area, the Minnesota Legislature established the Metropolitan Council in 1967 to deal with long-range planning problems common to the region.[4] In 1969, the legislature enacted the so-called Metropolitan Sewer Service Act (Act) [5] to deal with water pollution and sewage disposal in the metropolitan area, placing administrative responsibility in the Board.

---

[1] Now known as the Metropolitan Waste Control Commission. L. 1974, c. 422, § 2. In 1975 the legislature repealed Minn. St. 1974, cc. 473B and 473C, and other chapters relating to metropolitan government, and enacted similar provisions to replace them. L. 1975, c. 13.

[2] See Minn. St. 1971, § 473B.02.

[3] A more detailed and technical version of this opinion has been filed with the clerk of the Supreme Court and made available to the parties.

[4] The metropolitan area consists of the counties of Anoka, Carver, Dakota, Hennepin, Ramsey, Scott, and Washington. Minn. St. 1971, § 473B.02, subd. 1.

[5] L. 1969, c. 449.

Appellants are municipalities located within the metropolitan sewage disposal system who are seeking relief against the Board, Council, and other municipalities within the system. Appellants allege that they have been wrongly affected by actions of the Board and Council involving distribution of the cost incurred on account of metropolitan treatment works and interceptors [6] in existence, but not presently used.[7]

Under the Act, the Council and the Board are given broad authority [8] to implement the legislative purpose and policy.[9] Also pertinent here is § 473C.08 of the Act, which relates to the allocation of costs among the local government units within the waste disposal system and grants to the Board authority to adopt whatever means of allocating costs as may be fair, reasonable, and equitable.

In the first years of the system's operation, budget years 1971 and 1972, the total amount of reserve capacity [10] set aside for all local units of government was determined, generally, by estimating the probable future sewage disposal requirements of the individual units through the year 2000, or whenever, before that time, attainment of a unit's full growth was predicted. To the extent that actual flow increased, and barring other alterations

---

[6] Among others, these facilities were acquired by the Board, with Council approval, in response to the legislative mandate that the Board "assume ownership of all existing interceptors and treatment works which will be needed to implement the council's comprehensive plan for the collection, treatment, and disposal of sewage in the metropolitan area * * *." Minn. St. 1971, § 473C.05, subd. 1.

[7] Because of projected development, population growth, and construction cost considerations, both interceptors and treatment works are built larger than present need requires.

[8] Minn. St. 1971, § 473C.15, subd. 1.

[9] Minn. St. 1971, § 473C.01.

[10] "Reserve capacity" describes a currently unused portion of the treatment works and interceptors intended for future needs and assigned to system users by the Board.

in assessment of reserve capacity, a unit's reserve capacity was reduced each year.

Experience under this formula proved unsatisfactory to the Board. In December 1972, the Board announced a new method for allocation and collection of costs attributable to reserve capacity. This new "Service Availability Charge" method (SAC) involved the placing of all reserved capacity costs in one cost pool. Each system municipality would then collect a connection charge from the builder for each building permit issued on new construction and each sewer permit issued for connection of old construction. The change to the SAC method of allocating costs resulted in the present controversy. The order and judgment from which the appeals have been taken constitute a determination by the trial court that SAC is permitted by law.

The essential questions for decision on this appeal are:

(1)   Whether SAC fulfills the statutory directive that local units of government pay the costs for unused system capacity "in proportion to the amounts of such capacity reserved for each of them." Minn. St. 1971, § 473C.08, subd. 3;

(2)   Whether SAC complies with Minn. St. 1971, § 473C.08, subd. 4, which requires "allocation of current costs * * * for estimated unused capacity in the service area interceptors among local government units in the service area for which unused capacity therein has been reserved, in the same manner as that provided in subdivision 3";

(3)   Whether the Board and Council acted arbitrarily and unreasonably in adopting SAC, assuming statutory authority for SAC's adoption;

(4)   Whether the rights of the local units of government were prejudiced by the trial court's reaching an affirmative answer to (1) and (2) and granting the Board's motion for summary judgment, or by the trial court's determining that the costs so allocated were required to be paid pending complete resolution of the issues raised.

■   The first issue raises a question as to the meaning of the

words "in proportion to the amounts of such capacity reserved for each of them" in the Act.[11] We are persuaded of the merit in respondents' claim that these key words do not constitute a precise statutory formula for allocating debt service costs of unused capacity because:

(1)  The amount of debt service costs to be assigned to treatment works requires an exercise of judgment, involving allocation of Federal grants and total debt service, on the part of the Board and Council;

(2)  The Board and Council must exercise judgment in deciding whether unused treatment works capacity is to be reserved to municipalities on a facility-by-facility basis, or on a system basis;

(3)  The Board and Council must exercise judgment in making long-range estimates of future demand for sewage outlets;

(4)  The Board and Council must exercise judgment in identifying the stage of system development at which reserve treatment works capacity is to be attributed to a municipality within the system.

Our cases place upon appellants the burden of showing error. Similarly, unless the record shows affirmatively to the contrary on appeal a presumption of correctness attaches to the actions of the court below. See, 1B Dunnell, Dig. (3 ed.) §§ 368, 370, 374.

We cannot agree with appellants that the crucial language of § 473C.08, subd. 3, clearly requires, to the exclusion of any other method, the employment of the cost allocation method used by the Board in 1971 and 1972. In the absence of clearer legislative direction than we find in the statute, or in the history of the Act,[12] we are not persuaded that the trial court erred in deciding

---

[11] Minn. St. 1971, § 473C.08, subd. 3.

[12] This action was commenced in October 1972. The Council had approved SAC the same month and by December 1972, the formula had been readied for operation in January 1973. The trial court determined by mid-December 1973 that SAC was authorized by the Act; by early February 1974, the court had ruled that SAC was also reasonable. Al-

that the costs allocation concept known as SAC is within the bounds of the law.

Given the numerous variables involved in planning and operating a metropolitan sewer system,[13] it seems reasonable to us to conclude that the legislature intended to vest considerable discretion as to the precise method of allocating reserve capacity costs in those persons charged with the system's well-being to determine the precise method of allocating reserve capacity costs. Certainly the Board's grant of authority was broad. Minn. St. 1971, § 473C.15, subd. 1 bestows on the Board "all powers which may be necessary or convenient" to the discharge of its duties. A further demonstration of the legislature's intent to give the Board fairly broad powers can be found in Minn. St. 1971, § 473C.08, subd. 8, which, in some situations at least, authorizes the Board to adopt "such other means and methods of allocating costs * * * as may be fair, reasonable and equitable" when the cost allocations otherwise arrived at result in imposing on a municipality or service area increased costs which are unreasonable or inequitable. Our view as to the extensiveness of the Board's discretion is corroborated by the fact that the 1971-1972 formula was arrived at after considerable staff debate and the exercise of discretion by both the Board and the Council in making judgments required to produce it. Moreover, the Board's assessment of reserve capacity costs against individual communities has changed from time to time as the Board exercised its

---

though the legislature was in session and did spend considerable time in passing upon matters of metropolitan government during the 1973 and 1974 sessions (see L. 1973, cc. 498 and 779, and cc. 236 and 465, which amended the Act; L. 1974, cc. 346, 359, 371, 528, 563, 565, 573, 574, and c. 422 which amended the Act), we find no indication that the legislature ever reacted to what appellants consider to be a major abuse of legislative power and, we assume, brought to the attention of metropolitan legislators during either or both of these sessions.

[13] For example, the varying rates of population growth and the resulting necessity of judgmental determinations regarding how much reserve capacity is and should be maintained in any given municipality.

better judgment in the light of changing factors. The adoption of the SAC formula strikes us as a similar exercise of the Board's considerable discretion.

If the method of cost allocation chosen is one which will, so far as can now be reasonably anticipated, spread the ultimate cost burden of establishing and maintaining an unused capacity as a reserve capacity among the municipalities in a way proportionate to the benefits which accrue and which are anticipated, over time, to accrue because unused capacity is available when needed, the Board has complied with the legislative standard. We are satisfied that the legislature intended to permit current costs of unused capacity to be allocated among the municipalities, by a system of administrative reservation, in such a way that each unit of government will ultimately pay for the benefits to be received by it by reason of design and construction in anticipation of its future needs.

Our understanding of SAC is that, so far as can now be reasonably anticipated, over a period of time SAC will accomplish more precisely than the prior method what the statute calls for in principle: Payment of those costs for unused capacity attributable and administratively assigned or reserved to individual municipalities. SAC requires municipalities to pay, on an annual basis, only that sum necessary to retire the amount of unused system capacity which the budget year experience demonstrates was, in effect, reserved to the individual municipality for that year.

While it is theoretically possible that there will eventually be no more sewer construction because the system's municipalities will have attained their maximum growth, or at some future time debt service costs may be less than they are today because of less construction then to be done, we have not been convinced that the likelihood of these theoretical situations occurring is so great as to require us to strike down the challenged method of cost allocation. Whatever doubts presently remain for us are resolved by consideration of the language found in §§ 473C.01 and

473C.15. In so far as application of SAC may later demonstrate practical inequity in a given situation, we reserve our judgment.

While we are uncertain whether § 473C.08, subd. 8, applies in the situation at hand, or only where the costs were paid by a local governmental unit serviced by another municipality or sewer district before 1969, the broad authority given to the Board to allocate costs by any method considered by it to be "fair, reasonable and equitable" suggests a legislative intent to vest the Board with considerable discretion in choosing exact methods of cost allocation.

In short, we hold that SAC fulfills the statutory directive that local units of government pay the costs for unused system capacity in proportion to the amounts of such capacity reserved for each of them.

■ We also conclude that SAC complies with Minn. St. 1971, § 473C.08, subd. 4. Allocation principles of § 473C.08, subd. 3, discussed above, are incorporated by reference in subd. 4; our reasoning there applies equally here. Additionally, however, subd. 4 requires allocation of debt service costs for unused capacity in service area [14] interceptors to be spread among the municipalities in the service area. We have not been persuaded that SAC violates the principles of § 473C.08, subd. 4, in this respect either. We note the motion passed by the Board on December 5, 1973, determining that it will not collect from any sewer service area more than the capital cost of the plants and interceptors serving the area.[15] So long as this motion is adhered to, and, if subjected to challenge on the basis of experience, can be

---

[14] Service areas are administratively adopted land masses roughly bounded by watersheds within the metropolitan sewer service system. Minn. St. 1971, § 473C.08, subd. 7.

[15] The Board's minutes reflect this: "Mr. Baker moved that the Metropolitan Sewer Service Board will not collect from any Sewer Service Area more than the capital cost of the facilities, interceptors or treatment works, or both, which have been or will be acquired or constructed to serve the Service Area. Motion was seconded by Mr. Stenseng. Motion carried unanimously."

shown to have properly limited the costs it is designed to limit, neither the cost allocation principles we have found in the statute, nor concepts of reserving unused capacity, will, in our present estimation, have been subverted. Indeed, any other holding would run counter to what we have said above about the Board's authority and discretion. The effect of the motion is to limit, at least, the total of interceptor costs to the sewer service area in which they are incurred. The statutory concept of proportionality in payment for unused interceptor capacity reserved for individual municipal use is then preserved in the manner we have described above.

Additional support for this result is found in other subdivisions of § 473C.08. In subd. 7, the legislature has authorized the Board and Council to establish sewer service areas, a most significant and flexible administrative power. And in subd. 5, the Board and Council may also impose the cost burden of particular interceptors upon all local government units in the metropolitan area.

■ Plaintiffs argue that the cost allocation system adopted by the Board and Council commencing in 1973 is arbitrary and unreasonable. But so far as we can determine, the unit charge is within the capacity of the actual users to pay, should the municipality elect to pass on the cost attributed to it by SAC. That some communities will be required to pay more under SAC in a given year than might have been the case under the allocation system employed in 1971 and 1972 is not proof that SAC is unfair or unreasonable.

It is unnecessary for us to decide whether SAC is better than the cost allocation method employed in 1971 and 1972. The record before us reveals that SAC was the product of intensive Board research and study and that it was carefully evaluated by the trial court. The Board and Council, aided by qualified experts, concluded that the pre-1973 cost allocation method produced unfairness and inequities which have been remedied to a substantial degree by SAC, and that the latter is to be preferred. Further-

more, the trial court found no objectionable unfairness or unreasonableness in SAC after close study. And after a searching review of the material before us, we have not been persuaded, as we must be, that the process by which the allocation formula was developed, or the presently foreseeable consequences of SAC's application, produce or will produce results which are unreasonable, unfair, or arbitrary in legal effect.

■ Although pleaded, appellants do not claim a violation of Federal or state constitutional rights in this court.[16]

■ The order of the trial court granting summary judgment on part of the claims made established only that the allocation formula adopted by the Board and Council was within the statutory authority found in Minn. St. 1971, c. 473C. With respect to that phase of the matter, there were no questions of fact to be resolved. The resolution of the legal issue in response to the motion for summary judgment was proper.

Our determination that SAC was authorized and that appellants have failed to show it to be arbitrary and unreasonable moots appellants' claim that payment of the charges should have been deferred until final resolution of the declaratory judgment action.

■ The decision of the trial court does no more than conclude that SAC is authorized by the Act and that it is not inherently unfair, arbitrary, or unreasonable. While we affirm this conclusion, our affirmance will not bar proceedings which may be instituted by any municipality or individual intending to establish that the Act, in application, does actually result in arbitrary, unreasonable, or confiscatory impositions.

■ Appellants specially direct our attention to the situation of the village of Maple Plain and argue that the village has been unfairly and unlawfully charged with the interceptor reserved capacity costs. Appellants stress that the village is not presently

---

16 With respect to the village of Maple Plain, appellants do argue, without specific constitutional reference, that "[a] law must, to be valid, apply equally to similarly situated objects."

served by an interceptor, that it has no interceptor capacity assigned to it, and that it is without reserved capacity.

Respondents argue that the village is already using the metropolitan sewer system, and that millions of dollars have already been spent on interceptors which will eventually serve the village. We are cited to Minn. St. 429.051 for the proposition that "[a]ssessing costs for sewers not available for actual use without the construction of additional sewers is both common place and authorized by law."

While it may be true that it has not always been inappropriate to assess some municipal sewer costs against those not directly benefiting from the improvement, § 473C.08, subd. 4, seems to us to be an unequivocal legislative statement that no local unit of government within a given sewer service area is required to pay interceptor reserve capacity charges until it is determined by the Board that, during the budget year in question, a specified quantum of unused capacity in one or more service area interceptors has been reserved for the benefit of such local unit of government. The mere letting of an interceptor construction contract is not in and of itself enough to justify the assessment of interceptor reserve capacity costs against a given municipality. Distinct, formal action by the Board reserving a portion of the unused reserve interceptor capacity to the particular municipality is also required. Minn. St. 473C.08, subd. 4. In our view, the letting of a construction contract would not justify allocation of reserve capacity and assessment of proportional reserve capacity costs unless actual construction is to begin within a reasonably short time after the contract is awarded. Even then, the Board must act in a fashion which meets the standards of reasonableness applicable to actions taken by an administrative agency such as the one involved here.

Our review of the record does not demonstrate to us that any such reservation of unused interceptor capacity was made for the village of Maple Plain during the period in question. Accordingly, we reverse as to Maple Plain and remand to the dis-

trict court for the purpose of evaluating what sum of money paid by Maple Plain under these circumstances should be returned to that village with appropriate interest.

Affirmed in part; reversed in part; and remanded with directions.