# METROPOLITAN WASTE CONTROL COMMISSION v. CITY OF MINNETONKA.

242 N. W. 2d 830.

May 21, 1976—No. 46125.

Dorsey, Marquart, Windhorst, West & Halladay, Thomas S. Hay, John D. Levine, and J David Jackson, for appellant.

Carl F. Dever, for respondent.

Heard before Rogosheske, Peterson, and Yetka, JJ., and considered and decided by the court en banc.

PETERSON, JUSTICE.

We reverse an order of the district court affirming and refusing to vacate an arbitration award in which the arbitrators exceeded their powers under the restricted terms of the submission.

Plaintiff, Metropolitan Waste Control Commission (hereafter "commission"), is organized under Minn. St. c. 473C for the purpose of collecting, treating, and disposing of sewage in the seven counties over which it has jurisdiction. Section 473C.08, subds. 3 and 4, requires that costs of debt service attributable to reserved capacity of treatment works and interceptors be allocated among local government units, including defendant city of Minnetonka.

On October 12, 1972, the commission adopted a cost allocation

method known as the Service Availability Charge (SAC), recently upheld by this court in City of Brooklyn Center v. Metropolitan Council, 306 Minn. 309, 243 N. W. 2d 102 (1975). The SAC method provided that debt service would be financed by charges against new sewer connections. The basic charge for each new connection in 1973 was $275 per anticipated basic sewage flow unit of 100,000 gallons per year, with successive increases of $25 per year in subsequent years. The SAC allocation method became effective on January 1, 1973.

The controversy in this litigation concerns the application of the SAC system to residential housing units existing prior to January 1, 1973, and when Minnetonka knew the terms under which the plan would apply to such units. An August 9, 1972, letter from the commission to all local government units, including Minnetonka, contained the following statement:

"* * * Under the [proposed] revised policies, no distinction will be made between newly constructed housing units coming into the metropolitan system and existing housing units coming into the metropolitan system for the first time. Both are considered new to the metro system. This means that beginning January 1, 1973, all existing housing units not connected will have to pay the charge at the time in which they connect. Under the previous [proposals], existing units not already connected had 24 months in which to hook up once service is available to avoid the charge."

As adopted on October 12, 1972, the SAC plan was further revised to reduce the charge on existing units by one-half as follows:

"* * * Existing buildings or construction for which building permits are issued prior to January 1, 1973, should be charged one-half the established rate for 1973 if connected prior to January 1, 1974, and the full rate thereafter."

In regulations promulgated on December 6, 1972, the application of the SAC plan to existing units was stated as follows:

"B. Sewer Connection Permit SAC Unit Charges:

"1. All sewer connection permits issued by a municipality under its municipal ordinances for connections to be made on or after January 1, 1973 will be subject to a SAC unit charge except in the following cases:

\* \* \* \* \*

"C. The sewer connection permit was issued and the sewer to which the connection was to have been made existed prior to January 1, 1973."

Although this was the earliest published statement that the SAC unit charges could be avoided if a sewer connection permit was issued prior to January 1, 1973, Minnetonka's representatives attended the October 12, 1972, meeting at which the SAC plan was adopted by the commission. A memorandum prepared by Minnetonka's administrative staff indicates:

"At the October 12, 1972 Metropolitan Council meeting the Service Availability Charge (SAC) for reserve capacity in the Metropolitan Sewer district interceptor sewers was passed. In essence, this provides for the following method of payment of the SAC.

"1. Permits to connect to an existing sanitary sewer, taken out in the individual municipalities before January 1, 1973 would not be required to pay any SAC."

This staff memorandum is dated December 7, 1972, but defendant city concedes that it was prepared on the basis of information derived from the October 12, 1972, meeting.

Thus, at least as early as October, Minnetonka understood that sewer connection permits would have to be issued prior to January 1, 1973, in order to avoid the SAC charge on existing units. Nevertheless, unlike other municipalities within the sewer district, Minnetonka took no steps to give prompt notice of the approaching deadline to its homeowners. By the time the staff memorandum was released on December 7, 1972, it was evident that all of the 1,500 eligible homeowners could not effectively

apply for and obtain sewer connection permits prior to the January 1, 1973, deadline. Minnetonka, in the interest of its homeowners, considered various methods for minimizing its share of the metropolitan sewer system costs. Among the alternatives proposed in the staff memorandum was one which provided—

"* * * that permits would be issued before January 1, 1973 and be valid for a 1 year period, to all home owners that have sanitary sewer available now or would have sanitary sewer available in 1973, which would be under contract as of December 1, 1972. That would involve 1,500 homes, leaving approximately 7,000 homes that would be paying the SAC after January 1, 1974. If any of the 1,500 homes do not hook up before January 1, 1974, they will be required to pay the full SAC."

This proposal was adopted by Minnetonka on December 18, 1972, in the following resolution:

"That the city staff be and hereby are authorized to set up administrative procedures designed to issue sewer connection permits to all existing premises containing a structure to be served by sewer providing a lateral service is presently in existence to provide such service, or may be in existence in 1973 as a result of contracts let prior to December 1, 1972, and providing that an actual physical connection be made prior to January 1, 1974."

It is agreed that 888 permits were issued pursuant to this resolution. None were actually issued prior to January 1, 1973, as required by the SAC regulations. All were backdated to December 28, 1972.

This irregular procedure was subsequently discovered, and the commission demanded payment in accordance with its SAC regulations. When Minnetonka refused to pay, the parties agreed to submit the matter to a tripartite board of arbitrators composed of one neutral arbitrator and two representatives designated by the parties. The terms of the submission in relevant part recited that—

"* * * an actual controversy exists between the [commission] and the City concerning the interpretation and implementation of the rules promulgated by the [commission] on the method of allocation and collection of Reserve Capacity Charges effective as of January 1, 1973,"

and their agreement—

"to submit such controversy to arbitration in accordance with the provisions of Sections 572.08 to 572.30, Minnesota Statutes."

The compromise award signed by the neutral arbitrator and the representative designated by Minnetonka was issued in due course. Of the 888 permits involved, the award required Minnetonka to pay the SAC charges on only 444 permits. It was this award which the district court affirmed.

We hold that the arbitrators manifestly exceeded the powers conferred under the restricted terms of this submission. Minn. St. 572.19, subd. 1(3), provides that an award shall be vacated where the arbitrators have exceeded their powers.

The scope of the arbitrators' power is controlled by the language of the submission. Layne-Minnesota Co. v. Regents of University of Minnesota, 266 Minn. 284, 288, 123 N. W. 2d 371, 375 (1963); Atcas v. Credit Clearing Corp. of America, 292 Minn. 334, 341, 197 N. W. 2d 448, 452 (1972); Dunshee v. State Farm Mutual Auto. Ins. Co. 303 Minn. 473, 481, 228 N. W. 2d 567, 572 (1975). Where the arbitrators are not restricted by the submission to decide according to principles of law, they may make an award according to their own notion of justice without regard to the law. Zelle v. Chicago & N. W. Ry. Co. 242 Minn. 439, 446, 65 N. W. 2d 583, 589 (1954). Where the arbitrators are restricted, however, they have no authority to disregard the law, which in this case consisted of the terms of the submission and the SAC rules which they were directed to interpret and implement.

The arbitrators expressly found that Minnetonka's procedures "did not strictly comply with the SAC rule as it is worded." Having thus interpreted the rule, the only applicable implemen-

390

tation was to order payment of the SAC charges in accordance with the rule. The arbitrators, however, undertook to impose their own notions of equity based upon a finding that the irregular procedures used by Minnetonka were "followed with a good faith conviction that the City was substantially complying with the rule." It is undisputed that all of the permits issued to the 888 homeowners, although actually issued after the January 1, 1973, deadline in the commission's rule, were backdated, and that Minnetonka alone, among approximately 100 municipalities affected by the rule, undertook to thus avoid proper SAC charges. However disparate our perception of "the equities" may be from that of the arbitrators, in any event, the arbitrators had no authority to import such considerations under this restricted submission.

We reverse the order denying plaintiff commission's motion to vacate the award and, for the further proceedings required under Minn. St. 572.19, subd. 3, remand to the district court.

Reversed and remanded.