The CITY OF LAKE ELMO, Relator,

v.

METROPOLITAN COUNCIL,
Respondent.

No. A03–458.

Court of Appeals of Minnesota.

Dec. 16, 2003.

Review Granted Feb. 25, 2004.

Thomas F. Pursell, Forrest D. Nowlin, Lindquist & Vennum, PLLP, 444 Cedar Street, Suite 1700, St. Paul, MN 55101 (for relator).

Andrew D. Parker, Michael D. Christenson, Charles B. Holtman, Smith Parker, PLLP, 808 Colwell Building, 123 North Third Street, Minneapolis, MN 55401 (for respondent).

## OPINION

SHUMAKER, Judge.

Appellant City of Lake Elmo appeals from respondent Metropolitan Council's adoption of the resolution requiring Lake Elmo to modify its proposed 1998 Comprehensive Plan Amendment. An administrative law judge reviewed this matter and recommended that the Metropolitan Council (the council) adopt the resolution because Lake Elmo's plan has a substantial impact on or contains a substantial departure from metropolitan system plans. Thus, the council was authorized to require modifications of Lake Elmo's plan. Because there is a preponderance of evidence in the record to support a conclusion that Lake Elmo's plan will have a substantial impact and does substantially depart from the council's plan, and the agency's determinations are consistent with this finding, we affirm.

## FACTS

Appellant City of Lake Elmo is located about ten miles east of St. Paul in Washington County. Lake Elmo is bounded to the south by I–94, to the north by Highway 36, to the west by the city of Oakdale and I–694. Lake Elmo is primarily rural with a population of about 7,000 people,

and it has sought to retain a rural character. As of 2000, Lake Elmo had 2,347 households and 1,635 jobs.

*Sewer System*

Most of Lake Elmo is served by individual sewage treatment systems that the city proposes to maintain and expand as necessary. However, the southwest corner of Lake Elmo, adjacent to I–94, has a 120–acre area that is served by a metropolitan sewer system, called the WONE (Woodbury, Oakdale, Northdale, East Oakdale) interceptor, which does not have much additional capacity and could not support large-scale urbanization in Lake Elmo. Because the WONE Interceptor will be fully utilized in the future, the council began planning for additional wastewater service to Lake Elmo.

The council, Lake Elmo, and representatives of other nearby cities met to consider alternatives for handling sewer-system demands. The council reviewed Lake Elmo's plan to update its sewer systems in light of the council's plan and determined that Lake Elmo's plan to maintain and expand individual sewage treatment systems conflicts with the council's plan. The council concluded that Lake Elmo's plan had a substantial impact on and contained a substantial departure from the council's system plans and thus required modification. Lake Elmo argues that the council's requirement that the city modify its sewage system plan exceeds the council's statutory authority.

*Population Density*

Three principal highways, I–94, I–694, and Highway 36 run through or border Lake Elmo. I–94 will expand to improve traffic flow within the next 25 years. There is existing expansion capacity on I–94 through Lake Elmo. The council recommends a housing density of approximately seven units per acre as the standard for supporting cost-effective transit service.

The council advised Lake Elmo of the council's plan and indicated what the city needed to plan for when updating its own plan. The council's plan advised Lake Elmo to expand its existing urban area by 1,500 "sewered households" and 1,000 "sewered employees" by 2020. The council identified I–94 as a freeway transit corridor and stated that Lake Elmo's city plan should identify opportunities for development within one-quarter mile of this corridor. The council contends that if development does not occur in Lake Elmo to accommodate the growth predicted by the council, it is possible that the growth will occur in other surrounding cities where it will be more expensive to provide urban services. Lake Elmo argues that the council's adoption of a resolution that requires Lake Elmo to modify its plan to accommodate growth in population density exceeds the council's statutory authority.

After review by an administrative law judge (ALJ), the council adopted a resolution to require Lake Elmo to modify its Comprehensive Plan Amendment in accordance with the ALJ's recommendation, and Lake Elmo filed a petition for writ of certiorari. This appeal followed.

## ISSUES

1. What is the proper standard of review when an aggrieved party appeals from a final decision of the Metropolitan Council under Minn.Stat. § 473.866 (2002)?

2. Did the Metropolitan Council exceed its statutory authority when it required the City of Lake Elmo to conform to the council's plan when it concluded that the City of Lake Elmo's plan was in conflict with the council's plan and would have a substantial impact on or contains a substantial departure from the Metropolitan Council's plan?

3. On review, may this court examine evidence that the administrative law judge excluded from the record?

## ANALYSIS

The council's authority to require modifications in a local governmental unit's comprehensive plan is granted by statute in the Metropolitan Land Use Planning Act (MLPA). Minn.Stat. § 473.851 (2002). The parties agree that, under the MLPA, the council is responsible for the long-range planning and programming of the sewer and transportation infrastructure of the Twin Cities metropolitan area. *Id.* Under the MLPA, the council is required to develop a comprehensive development guide and system plan for the metropolitan area that considers, among other things, wastewater and transportation services. *Id.*

Also, under the MLPA, every governmental unit is to prepare a comprehensive municipal plan (city plan) that shows its land-use planning and projections. Minn. Stat. § 473.858, subd. 1 (2002). The city plan is implemented by adoption of zoning ordinances and zoning ordinances may not conflict with the city plan. *Id.* The council must then review and comment on the city plan of each city in the metropolitan area to determine its compatibility with other comprehensive plans and metropolitan system plans. *Id.*, subd. 2 (2002). "A local governmental unit shall not adopt any official control or fiscal device [that] is in conflict with its comprehensive plan or [that] permits activity in conflict with metropolitan system plans." Minn.Stat. § 473.865, subd. 2 (2002). But it is presumed that the legislature intends to favor a public interest over a private interest. Minn.Stat. 645.17(5) (2002).

### 1. *Standard of Review*

■ The parties to this appeal disagree as to the standard of review that applies and whether this court is to give deference to the administrative agency's or the ALJ's recommendation. Specifically, Lake Elmo argues that "the statutory standard of review requires that no deference be given to the Metropolitan Council's decision," while the council argues that this "court is to defer to the ALJ findings and conclusions and to [the] Council Resolution [that] adopt[ed] those findings and conclusions." We agree with the council.

■ On judicial review of administrative decisions by this court, substantial deference must be accorded to the fact-finding processes of an administrative agency. *Quinn Distrib. Co. v. Quast Transfer, Inc.,* 288 Minn. 442, 448, 181 N.W.2d 696, 699 (1970). In addition, Minn.Stat. § 473.866 (2002) is controlling in cases involving a challenge to the adoption of the council's resolution and provides that

> [t]he scope of review shall be that of section 14.69, provided that: (1) the court shall not give *preference* to either the administrative law judge's record and report or the findings, conclusions, and final decision of the council, and (2) the decision of the court shall be based upon *a preponderance of the evidence* as contained in the record on appeal.

(Emphasis added.) The judicial authority statutorily granted by section 14.69 provides in relevant part that this court may reverse or modify the decision of an agency if the administrative findings, inferences, conclusions, or decisions are "unsupported by substantial evidence in view of the entire record as submitted." Minn. Stat. § 14.69 (2002).

A determination of the proper standard and scope of review here requires statutory interpretation of the language of Minn. Stat. § 473.866 and section 14.69, within the guidelines provided by caselaw on the review of administrative decisions. When

the language of a statute is plain and unambiguous, that plain language must be followed. Minn.Stat. 645.16 (2002). Here, caselaw provides that this court gives deference to administrative agencies and supports the relevant statutory language. *See, e.g., Quinn Distrib. Co.,* 288 Minn. at 448, 181 N.W.2d at 699. The language of the statute is plain and unambiguous, and our deferential review "shall not give *preference* to either the administrative law judge's record and report or the findings, conclusions, and final decision of the council." Minn.Stat. § 473.866 (emphasis added). Thus, this court will give deference to the agency, but will not give preference to either the agency's determination or the ALJ's recommendation.

■■■ This court also looks to the statutorily defined "record on appeal" and standard of proof in making our determination. We note that the legislature did provide specifically for a standard of proof in Minn.Stat. § 473.866, and that standard of proof is different from the standard of proof of "substantial evidence" provided generally under section 14.69. Thus, this court must determine that the evidence in the record meets a preponderance-of-evidence standard rather than a substantial-evidence standard. And because our decision is limited to the record as defined by statute, in making our determination we look only to "[t]he record on appeal [consisting] of: (1) the administrative law judge's record and report, and (2) the findings, conclusions and final decision of the council." Minn.Stat. § 473.866.

## 2. The Council's Authority

■ Lake Elmo argues that the council does not have statutory authority to dictate the future population density of a rural community by use of its Water Management Policy Plan or the MLPA. Thus, we look to the statutory provisions to de-termine the council's purpose and authority.

The purpose of the MLPA is "to provide assistance to local governmental units ... for the preparation of plans and official controls appropriate for their areas and consistent with metropolitan system plans." Minn.Stat. § 473.851. " 'Metropolitan System Plans' means the airports and transportation portions of the metropolitan development guide, and the policy plans, and capital budgets for metropolitan wastewater service, transportation, and regional recreation open space." Minn.Stat. § 473.852, subd. 8 (2002). Thus, both sewer and transportation fall within the ambit of the council's authority.

In furtherance of its authority and purpose, the MLPA requires the council to "prepare and adopt guidelines and procedures relating to the requirements and provisions of [the MLPA] which will provide assistance to local governmental units ... in accomplishing the provisions of [the MLPA]." Minn.Stat. § 473.854 (2002). The MLPA requires each local governmental unit in a metropolitan area to prepare and adopt a local comprehensive plan to "guide public and private land use, development, redevelopment and preservation for all [local] lands and waters." Minn. Stat. § 473.859, subd. 1 (2002). A local comprehensive plan has several required components, including a land-use plan. *Id.,* subds. 2, 3 (2002).

The local land-use plan must include "a housing element containing standards, plans, and programs for providing adequate housing opportunities to meet existing and projected local regional housing needs ... to promote the availability of land for the development of low and moderate income housing." *Id.,* subd. 2(c). The local land-use plan must also "ensure conformity with [the Council's] system plans." *Id.,* subd. 4 (2002). The plan

must also "provide sufficient existing and new housing to meet the local unit's share of the metropolitan area need for low and moderate income housing." *Id.*, subd. 4(3).

When a local governmental unit preliminarily approves its own land plan, the unit must submit its comprehensive plan to the council for review before its governing body grants final approval. Minn.Stat. § 473.858, subd. 3 (2002). On review of the unit's plan, the council is required to determine (1) its compatibility with the comprehensive plans of other local governmental units in the metropolitan area and (2) its conformity with the council's system plans. Minn.Stat. § 473.175, subd. 1 (2002).

"The council may require a local governmental unit to modify any comprehensive plan *which may have a substantial impact on or contain a substantial departure from metropolitan system plans.*" *Id.* (emphasis added).

Here, the council's plan and Lake Elmo's plan differ as to what specifically will be the impact of population growth on the area under the council's authority. Thus, the issue here is what constitutes a "substantial impact on" or a "substantial departure from metropolitan system plans."

Lake Elmo accepts the council's 2020 population/household/employment forecasts, but the city wants to spread the households out in cluster developments. Lake Elmo does not directly address the differences between its plan and the council's plan; rather, it argues that its plan will not harm the metropolitan sewer system. In addition, Lake Elmo does not dispute that its plan departs from the system plans. The record shows that Lake Elmo's city planner described the council's and Lake Elmo's plans as being 180 degrees apart.

a. Sewer System

Lake Elmo challenges the council's decision and subsequent requirements, arguing that the city's decision to remain independent would not result in under-utilization of existing wastewater treatment infrastructure or in under-utilization of transportation infrastructure, and that the council conducted no studies to confirm its plan and corresponding claims that these infrastructures may be affected. Moreover, Lake Elmo argues that the only thing the council has is "a general view . . . that people will tend to stay in the same general area and people that are going to move to Lake Elmo or to Washington County will most likely stay in Washington County," and that this projection is "based on historical growth patterns, current land uses, and current local comprehensive plans."

The council directed Lake Elmo to plan for expansion of its existing urban area through 2020 at a minimum density of three dwellings per acre; to plan for approximately two-thirds of the remainder of Lake Elmo to be "urban reserve" at a density of one dwelling per 40 acres; and to keep the remaining one-third of Lake Elmo "permanent rural," at a density of one dwelling per ten acres. Lake Elmo does not dispute the accuracy of the council's growth predictions for the region, but rather argues that such growth is not desired in Lake Elmo.

The council argues that Lake Elmo's plan does not take into consideration the substantial urbanization of Lake Elmo that is projected to occur by 2040. The council based its plan on the forecasted need to accommodate 320,000 new households and 380,000 new jobs in the metropolitan region between 1995 and 2020, the close proximity of Lake Elmo to St. Paul, the availability of principal arterials (i.e.,

roads) immediately adjacent to Lake Elmo, the potential for transit services to the community in a cost-effective manner, and the availability of a regional park preserve within the city.

From 1990 to 2000, Lake Elmo's population growth rate was about 16.3 percent. For the same ten-year period, neighboring Oakdale's population growth rate was 45 percent, Woodbury's population growth rate was about 131 percent, and Cottage Grove's population growth rate was 33 percent.

The council argues that there is most likely sufficient existing capacity in the WONE Interceptor to accommodate the forecasted development in Lake Elmo only until 2030. The council's plan includes a proposed interceptor that will have the capacity to serve 13,500 households or residential equivalent units.

According to an analysis done by the council's assistant general manager of environmental services, if Lake Elmo's projected growth were to go elsewhere, it would be more costly to add sewage treatment capacity to those other areas in the metropolitan region to accommodate that growth than it would to build the Lake Elmo interceptor. The council's planned provision of regional sewer service to Lake Elmo is to serve existing and future urbanization in the community. The council's plan is not a result of any need to provide public sewer service because of failing or deficient individual sewage treatment systems or to prevent harm to the existing sewer system.

The record shows that (1) historical growth patterns, current land uses, and current local comprehensive plans project an overall increased population in this region based on evidence that neighboring community populations have increased anywhere from 33 percent to 131 percent from 1990 to 2000; (2) both parties agree

that growth and increased land uses will impact sewer and transportation systems; (3) the council projects substantial urbanization of Lake Elmo by 2040; (4) Lake Elmo recognizes the potential for growth in general in the region, but desires to maintain its rural character; (5) if Lake Elmo maintains its rural character, other local governmental units are very likely to be impacted by Lake Elmo's desire to maintain a rural character due to redirected commercial and residential development to other areas in the region, and that those other areas would likely bear the costs associated with growth and development; and (6) independent sewer systems may create environmental and financial risks.

Thus, the record sufficiently establishes by a preponderance of the evidence that Lake Elmo's city plan will have both a substantial impact on and contain a substantial departure from the council's plan. Because there is a preponderance of evidence to establish that Lake Elmo's comprehensive plan will have a substantial impact on or contains a substantial departure from the council's plan, the council acted within its statutory authority by requiring Lake Elmo to conform to the council's plan.

■ Lake Elmo also argues that by requiring Lake Elmo to conform to the council's plan, the council is forcing it to construct a new sewer system and that the council does not have this particular authority. Minn.Stat. § 473.871 provides: "Notwithstanding the provisions of sections 462.355, subd. 4, 473.175, and 473.851 to 473.871 the council shall have no authority under this chapter to require a local governmental unit to construct a new sewer system." Minn.Stat. § 473.871 (2002).

Although the statute is clear that the council may not specifically require Lake Elmo to construct a new sewer system, it

does not restrict the council's authority to identify insufficiencies in municipal services and systems and to require corrections that will conform to the council's plan. Such corrections might result in the need to build a new sewer system, which would be but a collateral result of conforming with the council's plan. Merely requiring the correction of insufficiencies does not necessarily dictate any particular correction but rather leaves it open to the municipality to devise corrective measures that are both consistent with its own plan and in conformity to the council's plan.

### b. *Population Density*

■ Lake Elmo also argues that the mandatory plan change authority of Minn.Stat. § 473.175, subd. 1 does not expressly grant or imply the power to determine municipal population or development density. It focuses exclusively on system plans and is stated as a check on the exercise of local authority. The Council's power here to change a plan if it *has* a substantial impact on metro system can indirectly cause a change in development density.

(Emphasis added.) Lake Elmo's argument is unsupported by law.

The language of the statute that provides the council must show that Lake Elmo's plan "may have" substantial impact does not support Lake Elmo's assertion that the council must show that Lake Elmo's plan "has" a substantial impact. Minn.Stat. § 473.175, subd. 1 (2002). Lake Elmo's argument that the term "substantial impact" means that an "actual and significant" impact has occurred results in an unreasonable interpretation that the legislature could not possibly have intended. For a "planning act" such as the MLPA to deal only after-the-fact with actual occurrences of impact rather than potential occurrences of impact would under-

mine the purpose of the Metropolitan Council's planning function.

The record shows that (1) development in areas served by freeways that are at or near capacity results in less efficient use of existing freeway capacity and thus, Lake Elmo's cluster homes may not conform to the region's needs for development; (2) the need for housing in the region is increasing and will continue to increase based on current percentiles of growth; and (3) a Builders Association of the Twin Cities Area based study indicates that Lake Elmo's proposed low-density development with on-site septic systems will make future urbanization cost-prohibitive.

The record establishes by a preponderance of the evidence that Lake Elmo's city plan may have both a substantial impact on and contain a substantial departure from the council's plan with respect to regional distribution of increasing population density. Because a preponderance of the evidence establishes that Lake Elmo's comprehensive plan may have a substantial impact on or contain a substantial departure from the council's plan, we conclude that the council acted within its statutory authority by requiring Lake Elmo to conform to the council's plan.

■ Lake Elmo's argument that the council's requirements are arbitrary and capricious is without merit, because so long as an agency is engaged in reasoned decision-making a court will affirm. *Cable Communications Bd. v. Nor-West Cable Communications P'ship*, 356 N.W.2d 658, 668–69 (Minn.1984). Here, the council engaged in reasoned decision-making when it prepared three alternative planning maps for Lake Elmo officials to consider in an attempt to resolve differences and based its determinations on the reasons discussed above.

Further, we note that Lake Elmo is not statutorily prohibited from complying with the council's resolution based on the mandate of Minn.Stat. § 473.865, subd. 2, that a local governmental unit may not adopt any official control or fiscal device in conflict with its existing comprehensive plan. The "object of statutory interpretation is to ascertain and effectuate legislative intent." *Boutin v. LaFleur*, 591 N.W.2d 711, 715 (Minn.1999). A local governmental unit is not prohibited from adopting the council's resolution even when it conflicts with the local governmental unit's existing comprehensive plan. To prohibit a local governmental unit from adopting a council resolution that conflicts with the local governmental unit's plans is plainly at odds with the purpose of the statute to address "problem[s] of urbanization and development [that] transcend local governmental boundaries," thus creating a "need for the adoption of coordinated plans, programs, and controls by all local governmental unites ... to ensure coordinated, orderly and economic development." Minn.Stat. § 473.851.

3. *Excluded Evidence*

Lake Elmo argues that this court should consider the testimony that was excluded by the ALJ, but provides no authority that would permit this court to do so. The statute provides that this court's review is limited to the administrative law judge's record and report and the findings, conclusions and final decision of the council. Minn.Stat. § 473.866. The testimony that was excluded was objected to on the grounds that it either questioned the need for or reasonableness of the Lake Elmo interceptor or challenged the need for reasonable population forecasts as a basis for system plans. The ALJ excluded the testimony under Minn.Stat. § 473.866, which provides "the subject of the hearing shall not extend to questions concerning the need for or reasonableness of the metropolitan system plans or any part thereof."

Because the statute limits our review to the record as provided, and the excluded testimony is outside of the record, this issue is not properly before this court. Even if this court had authority to consider the excluded testimony, the proposed testimony was properly excluded because it went to issues not within the scope of the hearing.

## DECISION

Because the Metropolitan Council did not exceed its statutory authority when it required Lake Elmo to conform to the council's plan when it concluded that the city's plan would have a substantial impact on or contains substantial departure from the council's plan, we affirm.

**Affirmed.**