The CITY OF LAKE ELMO, Appellant,

v.

METROPOLITAN COUNCIL,
Respondent.

No. A03–458.

Supreme Court of Minnesota.

Aug. 5, 2004.

Thomas F. Pursell, Forrest D. Nowlin, Lindquist & Vennum, PLLP, Minneapolis, MN, for Relator.

Andrew D. Parker, Charles B. Holtman, Michael D. Christenson, Smith Parker, PLLP, Minneapolis, MN, for Respondent.

## OPINION

BLATZ, Chief Justice.

This appeal arises out of the City of Lake Elmo's challenge to the Metropolitan Council's ("Council") final decision, Resolution 2003–10, which requires Lake Elmo to conform its comprehensive land use plan ("comprehensive plan") to the Council's regional system plans ("system plans"). *See* Metropolitan Council Res.2003–10 (April 7, 2003) (hereinafter "Resolution 2003–10"). The City of Lake Elmo argues that the Council does not have the statutory authority to adopt Resolution 2003–10 and, therefore, the resolution is not binding upon it. The court of appeals affirmed the Council's decision, holding that Lake Elmo's comprehensive plan may have both

a substantial impact on and contain a substantial departure from the Council's system plans. *City of Lake Elmo v. Metro. Council*, 674 N.W.2d 191, 198 (Minn.App. 2003). Applying the relevant statutory provisions, the court also concluded that the Council had the statutory authority to compel the City of Lake Elmo to modify its comprehensive plan. *Id.* We affirm.

In February 2002, the City of Lake Elmo, appellant, submitted its completed comprehensive plan to the Council, respondent, for review as required by Minn.Stat. § 473.858, subd. 1 (2002). Lake Elmo's comprehensive plan proposed to restrict future development and maintain the rural character of the city. On September 11, 2002, the Council adopted Metropolitan Resolution 2002–30 (hereinafter Resolution 2002–30), the initial resolution in this matter. The Council found that Lake Elmo's comprehensive plan "may have a substantial impact on or contain a substantial departure from" the Council's system plans. *See* Minn.Stat. § 473.175, subd. 1 (2002). The resolution required Lake Elmo to make nine modifications to its comprehensive plan that would allow for continued population growth through the year 2040. Lake Elmo contested the resolution and requested a hearing before an administrative law judge ("ALJ") pursuant to Minn. Stat. § 473.866 (2002).[1]

The ALJ addressed two issues: (1) whether Lake Elmo's comprehensive plan may have a substantial impact on or contain a substantial departure from the metropolitan system plans; and (2) whether the Council possessed the statutory authority to require modification of Lake Elmo's comprehensive plan in the manner prescribed by Resolution 2002–30. On March 13, 2003, the ALJ issued its report, findings of fact, and conclusions of law, determining that the Council met its burden of proof and showed by a preponderance of the evidence that Lake Elmo's comprehensive plan may have both a substantial impact on and contain a substantial departure from metropolitan system plans. The ALJ also concluded that the Council possessed the statutory authority to modify Lake Elmo's comprehensive plan. Following the ALJ's decision, the Council passed Resolution 2003–10, the Council's final decision. In that resolution, the Council adopted the ALJ's recommended decision in its entirety and decided that Lake Elmo must modify its comprehensive plan as prescribed in its first resolution, Resolution 2002–30. Lake Elmo then sought review of the Council's final decision from the court of appeals, which upheld the Council's decision in all material respects. *City of Lake Elmo v. Metro. Council*, 674 N.W.2d 191. We granted Lake Elmo's petition for review on February 25, 2004.

I.

Minnesota Statutes § 473.866 sets forth the scope of review applicable to contested Council decisions. By reference, it incorporates Minn.Stat. § 14.69 (2002), which states that a reviewing court may reverse or modify an agency's decision "if the substantial rights of the petitioners may have been prejudiced" because the administrative decision was, among other

---

1. Minnesota Statutes § 473.866 limits the breadth of the administrative hearing, stating that the subject of the administrative hearing does not extend to the need for or the reasonableness of the metropolitan system plans. Further, the statute provides that at the conclusion of the administrative hearing, the ALJ issues a report, which constitutes a recommendation to the Council. The Council is not bound by the recommendation, but may adopt, reject, or modify the ALJ's report to reach its final decision. Minn.Stat. § 473.866.

things, in excess of statutory authority, unsupported by substantial evidence, or arbitrary or capricious. Important to our review here, section 473.866 goes on to modify this traditional scope of review in two ways:

> The scope of review shall be that of section 14.69, provided that: (1) the court shall not give preference to either the administrative law judge's record and report or the findings, conclusions and final decision of the council, and (2) the decision of the court shall be based upon a preponderance of the evidence * * *.

First, the statute gives no preference to the fact-finder and, second, it adopts a preponderance of the evidence standard, rather than an "unsupported by substantial evidence" standard.[2] The preponderance of the evidence standard requires that to establish a fact, it must be more probable that the fact exists than that the contrary exists. *Netzer v. N. Pac. Ry. Co.*, 238 Minn. 416, 425, 57 N.W.2d 247, 253 (1953). If evidence of a fact or issue is equally balanced, then that fact or issue has not been established by a preponderance of the evidence. *Id.* The preponderance of the evidence standard is a higher standard than the substantial evidence standard set forth in section 14.69, which is the typical evidentiary standard applied by

appellate courts when reviewing agency decisions.[3] Therefore, in following the statutory dictates of section 473.866, we will give no "preference" to either the ALJ's report or the Council's decision. Additionally, when determining whether Lake Elmo's comprehensive plan may substantially depart from or substantially impact the Council's system plans, we will review the record applying the preponderance of the evidence standard, and decide whether the evidence supports Resolution 2003–10.

## II.

We first address Lake Elmo's arguments challenging the Council's statutory authority to require Lake Elmo to modify its comprehensive plan. Specifically, Lake Elmo argues that the Council lacks the statutory authority to "dictate" Lake Elmo's population density in the manner provided by Resolution 2003–10.

The Council was created by the legislature in 1967 to coordinate interdependent local governments in long-term development and to avoid sprawl within the Twin Cities metropolitan area.[4] *See City of Brooklyn Ctr. v. Metro. Council,* 306 Minn. 309, 311, 243 N.W.2d 102, 105 (1975), *rev'd on other grounds, City of Shorewood v. Metro. Waste Control Com'n,* 533 N.W.2d

2. The Council argues that this language means that equal preference is to be given to both the ALJ's record and report and the Council's findings, conclusions, and final decision, but does not "diminish[ ] the deference normally given to administrative agency decisions." While we recognize that appellate courts traditionally afford deference to fact-finders on questions of fact as appellate review does not typically lend itself to deciding facts de novo, we nevertheless respect the clear language of the statute and give no "preference" to either the ALJ's report or the Council's decision.

3. In the context of a contested agency decision, the substantial evidence test is satisfied when the evidence, considered in its entirety, is: (1) such that a reasonable mind might accept it as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than "some evidence"; and (4) more than "any evidence." *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn.1977).

4. The term "metropolitan area" is defined in Minn.Stat. § 473.121, subd. 2 (2002) and, with the exception of three cities (Northfield, Hanover, and New Prague), consists of the following counties: Anoka, Carver, Dakota, Hennepin, Ramsey, Scott, and Washington.

402 (Minn.1995); Minn.Stat. §§ 473.123, 473.851 (2002). To facilitate the long-term planning process, state law requires the Council to periodically prepare and adopt a comprehensive development guide, commonly known as the Regional Blueprint. Minn.Stat. § 473.145 (2002). The Regional Blueprint consists of "a compilation of policy statements, goals, standards, programs, and maps prescribing guides for the orderly and economical development, public and private, of the metropolitan area." Id.[5] In addition to the Regional Blueprint, the Council must also adopt "long-range comprehensive policy plan[s]" for airport, transportation, wastewater treatment, and park systems—the system plans. Minn Stat. §§ 473.146, subd. 1, 473.851, 473.852, subd. 8. (2002). These system plans must conform to the Council's Regional Blueprint. Minn.Stat. § 473.146. Each system plan must include forecasts of changes in population, households, employment, and land uses for the metropolitan area. Id. Together, the Regional Blueprint and the system plans coordinate and steer the Council's plans for the seven county metropolitan area over the next 40 years.

Subsequent to the creation of the Council, the legislature enacted the Metropolitan Land Planning Act ("MLPA"), which increased coordination between local governments and the Council. See Minn.Stat. §§ 473.851–.871 (2002). The MLPA clearly sets forth the policy and purposes supporting regional planning and the legislative goal that the parts of the metropolitan area work together for the benefit of the whole:

The legislature finds and declares that the local governmental units within the metropolitan area are interdependent, that the growth and patterns of urbanization within the area create the need for additional state, metropolitan and local public services and facilities and increase the danger of air and water pollution and water shortages, and that developments in one local governmental unit may affect the provision of regional capital improvements for sewers, transportation, airports, water supply, and regional recreation open space. Since problems of urbanization and development transcend local governmental boundaries, there is a need for the adoption of coordinated plans, programs and controls by all local governmental units and school districts in order to protect the health, safety and welfare of the residents of the metropolitan area and to ensure coordinated, orderly and economic development.

Minn.Stat. § 473.851.

Under the MLPA, each local government must periodically prepare or amend its own comprehensive plan and submit it for review and comment by the Council as well as by adjacent governmental units. Minn.Stat. §§ 473.858, subds. 1, 2, 473.864 subd. 2. The Council reviews the comprehensive plans of local governmental units "to determine their compatibility with each other and conformity with metropolitan system plans." Minn.Stat. § 473.175, subd. 1 (2002). If the Council finds that a local government's comprehensive plan "may have a substantial impact on or contain a substantial departure from metropolitan system plans," it can, by resolution, require the local government to modify its comprehensive plan. Id.[6]

5. For the purposes of this case, the relevant comprehensive development guide is the December 1996 Regional Blueprint.

6. We note that Minn.Stat. § 473.175, subd. 1, states that "[t]he Council may require a local governmental unit to modify any comprehensive plan or part thereof which may have a substantial impact on or contain a substantial departure from metropolitan system plans." Id. (emphasis added). Therefore, the plain

Lake Elmo takes issue with the reach of the Council's powers, specifically its requirement that it accommodate up to 9,350 sewered households at a minimum of 3 housing units per acre by 2040. Lake Elmo is a primarily rural city located about ten miles east of St. Paul and has approximately 2,350 households and 7,000 residents. In Lake Elmo's view, control of a city's population density, beyond any other factor, can affect the essential character of a community. Further, Lake Elmo believes that if the legislature wished to grant the Council such pervasive power over cities, it would have expressly done so by statute. Because no statutory provision explicitly grants the Council authority to order a city to reach "minimum density levels," Lake Elmo argues that the Council's practice of combining population forecasts with related system plans to dictate housing densities is impermissible and infringes on Lake Elmo's zoning authority in a manner unintended by the legislature.

We conclude, however, that when viewed against the plain and unambiguous language of the statutes at issue, Lake Elmo's argument is unpersuasive. The statutory scheme clearly gives such authority to the Council. In addition to the express responsibility to guide "the orderly and economical development, public and private, of the metropolitan area," several statutes expressly require the Council to devise extensive plans for the metropolitan area and expressly empower the Council to revise local comprehensive plans that are in conflict with the Council's overarching plan. Minn.Stat. §§ 473.145, 473.146, subd. 1; 473.175, subd. 1, 473.858, subd. 1. In short, the Council is required to predict population growth in its Regional Blueprint and in its system plans. Cities must

conform their comprehensive plans to the Council's system plans, and the Council may, by resolution, require modification of a city's comprehensive plan when it may have a substantial impact on or contain a substantial departure from the Council's system plans. *Id.*

In this case, the Council decided that Lake Elmo's comprehensive plan will cause inefficient utilization of existing and planned metropolitan transportation and sewer systems. After unsuccessfully attempting to persuade Lake Elmo to modify its comprehensive plan through informal dialogue, which included three alternative proposals, the Council adopted Resolution 2002–30, and finally Resolution 2003–10, concluding that Lake Elmo's comprehensive plan may have a substantial impact on or constitute a departure from the Council's system plans and ordering Lake Elmo to modify its comprehensive plan. Because we hold that the Council has the statutory authority to adopt resolutions, we turn to the second issue—whether the Council's final decision, Resolution 2003–10, was supported by a preponderance of the evidence.

### III.

▮ The second issue presented in this appeal concerns Lake Elmo's contention that the Council's resolution, concluding that Lake Elmo's comprehensive plan may have a substantial impact on or depart from the Council's system plans was not supported by a preponderance of the evidence. *See* Minn.Stat. § 473.175, subd. 1. To decide this issue an understanding of the framework within which regional planning occurs is necessary.

language of the statute establishes that either a substantial impact on *or* a substantial departure from the Council's plan, triggers the

Council's authority to require a locality to modify its plan.

In 1996, the Council produced the Regional Blueprint, the then-current comprehensive development guide, which forecasted population growth and related development in the metropolitan area based on historical trends, market forces, and an analysis of where regional urban infrastructure could be provided most cost-effectively. The Regional Blueprint divided Lake Elmo into three land classifications—urban, urban reserve, and permanent rural. "Urban" areas comprise lands either already developed or planned to be developed by 2020. "Urban reserve" areas comprise lands that lie just beyond the border urban areas, which will be developed between 2020 and 2040. The third classification, "permanent rural," includes lands that are not intended to be developed in the foreseeable future. From the Regional Blueprint's growth forecasts and land classifications, the Council was required, by statute, to prepare system plans for its four systems, i.e., wastewater treatment, transportation, airports, and parks. *See* Minn.Stat. § 473.146, subd. 1 (2002). The wastewater treatment and transportation system plans are the primary focus of Lake Elmo's appeal.

The Water Resources Management Policy Plan ("WRMPP") and the Transportation Policy Plan ("TPP") comprised the Council's then-current wastewater treatment and transportation system plans. Both system plans incorporated the Regional Blueprint into their infrastructure development forecasts. Taken together, the Regional Blueprint, the WRMPP, and the TPP made clear the Council's expectations for Lake Elmo's population density growth and the resulting services to be provided.

The WRMPP provided for the construction of a new regional wastewater interceptor to serve Lake Elmo and surrounding communities on the bases that the current interceptor serving the Lake Elmo area was nearing full capacity and because the majority of Lake Elmo fell within the Regional Blueprint's urban and urban reserve boundary.[7] The WRMPP projected Lake Elmo to absorb a sewered population increase of up to 1,500 households and 1,000 employees by 2020. Utilizing the WRMPP, projected population growth occurring in "urban" areas would bring Lake Elmo's total population to approximately 12,500 by 2020, with development occurring at a minimum density of three units per acre in the urban areas. Incorporating the goals and standards set forth in the Regional Blueprint, the WRMPP also calls for Lake Elmo to maintain an urban reserve area for further sewered development between 2020 and 2040. Resolution 2002–30 provides that urban reserve densities are not to exceed one unit per 20 acres so that, when the land is needed, development can proceed quickly and efficiently.[8] Resolution 2002–30 forecasted Lake Elmo's urban reserve to grow over the next four decades by 7,850 sewered households, with Lake Elmo's population reaching approximately 31,600 by the year 2040. Finally, the Regional Blueprint provides

7. The 1996 Regional Blueprint contains, among other things, a map that subdivides the metropolitan area into six land classifications. The land classifications chart planned expansion of metropolitan development for the foreseeable future. The map places the majority of Lake Elmo's land into the "urban" and "urban reserve" land classifications, signifying development prior to 2040.

8. The Regional Blueprint specifies that urban reserve density must not exceed one unit per 40 acres, unless the housing development is clustered. Such clusters are considered temporary, "until full urbanization occurs around them."

that the remaining Lake Elmo lands will be protected at rural development density, i.e., one unit per 10 acres.

In contrast to the Council's system plans, Lake Elmo sought to permanently limit development and maintain the rural character of Lake Elmo. Though Lake Elmo's comprehensive plan mirrored the WRMPP projection of growth to 12,500 residents by the year 2020, the city sought to develop low-density lots throughout Lake Elmo, rather than follow the Council's system plan of confining high-density acreage to a defined area. Lake Elmo proposed to disperse development across all Lake Elmo land at a density of six units per 20 acres or 16 units per 40 acres, with the undeveloped portion of the property placed in permanent easement for preservation as open space. When compared with the Council's system plans, Lake Elmo's comprehensive plan resulted in under-development within urban areas and over-development within urban reserve and permanent rural areas. In the Council's view, if allowed to go into effect, Lake Elmo's comprehensive plan would exhaust its supply of land by 2020 and severely limit, if not effectively prohibit, additional population growth beyond the year 2020. Furthermore, Lake Elmo's comprehensive plan envisions future sewer service from individual, on-site, sewage treatment systems, not the metropolitan sewer system.

After the Council received Lake Elmo's comprehensive plan, it determined, in Resolution 2002–30, that Lake Elmo must modify its comprehensive plan since it may have a substantial impact on and contain a substantial departure from the Council's system plans. In Resolution 2002–30, the Council made fourteen factual findings, which, among other things, stated that Lake Elmo's failure to plan for higher density development: 1) may result in underutilization of the three "principal arterial highways" that serve Lake Elmo; 2) may cause other municipalities to absorb growth reasonably expected to occur along transportation corridors; 3) may cause longer and more expensive commutes using more fuel and creating additional pollution; 4) may force the region to make additional transportation infrastructure investments to provide transportation access to the redirected population growth; 5) may force the region to invest in new sewer infrastructure, in addition to budgetary commitments already programmed for Lake Elmo, for other areas absorbing redirected population growth; and 6) may affect how the Council "plans, builds and operates its metropolitan disposal system in the Region surrounding the City of Lake Elmo." The Council concluded that Lake Elmo's comprehensive plan underutilized current and planned infrastructure and created a strong possibility that the Council may need to make duplicative plans and investments in transportation and wastewater treatment infrastructure in other areas of the metropolitan region to serve population growth that would have otherwise settled in Lake Elmo. Therefore, the Council found that Lake Elmo's comprehensive plan may have a substantial impact on or contain a substantial departure from the Council's system plans.

Lake Elmo contested Resolution 2002–30 before an ALJ, who reported extensive findings of fact and, like the Council, determined that the Lake Elmo's comprehensive plan may substantially impact and depart from the Council's system plans. The ALJ found that, through 2020, the Council and Lake Elmo proposed vastly different plans for Lake Elmo's development. The ALJ cited the testimony of Charles Dillerud, Lake Elmo's City Planner and Assistant City Administrator, who highlighted the density disparities between the plans of the Council and Lake Elmo.

Dillerud testified that the two plans differed as to urban density by a factor of six and that urban reserve densities represented a "substantial difference" between Lake Elmo's comprehensive plan and the Council's system plans. Further, the ALJ agreed with Dillerud that Lake Elmo's use of individual sewer systems, rather than the regional sewer system was an "important distinction" between the two plans. Specifically, the ALJ stated that Lake Elmo's comprehensive plan "fails to provide for any of the 1,500 sewered households identified in the regional system plan for water resources management" and instead envisions new households within Lake Elmo to be served by "individual sewage treatment systems (ISTSs) or constructed wetlands wastewater treatment systems (CWWTS)." Based on these findings, the ALJ determined that the differences between the two plans were "certainly 'considerable in extent' and constitute[d] a substantial departure within the meaning of the statute."

With respect to the substantial impact of Lake Elmo's comprehensive plan on the Council's system plans, the ALJ cited the testimony of Bryce Pickart, the Assistant General Manager for Environmental Services for the Council, and Natalio Diaz, the Director of Metropolitan Transit Services. Relying on their testimony, the ALJ found that the Council established that diverted growth from Lake Elmo will increase the burden on wastewater treatment and transportation facilities in other parts of the metropolitan area. The ALJ found that expanding sewer services and highways in other parts of the region will be more expensive than providing the same services in the Lake Elmo area. Based on the preponderance of evidence presented at the contested hearing, the ALJ concluded that Lake Elmo's comprehensive plan may substantially impact the Council's system plans.

Subsequent to receiving the ALJ's report, the Council rendered its final decision in Resolution 2003-10. In this resolution, the Council adopted the ALJ's report in its entirety, as well as the list of modifications it first required of Lake Elmo in Resolution 2002-30. Lake Elmo challenged the Council's final decision in the court of appeals, which concluded that a preponderance of the evidence supported the Council's decision that Lake Elmo's comprehensive plan may have a substantial impact on and depart from the Council's system plans. *City of Lake Elmo*, 674 N.W.2d at 198. We agree.

It is plainly evident that Lake Elmo's comprehensive plan may contain a substantial *departure* from the Council's system plans.[9] *See* Minn.Stat. § 473.175, subd. 1. By 2040, the Council has planned for Lake Elmo to reach a sewered population of over 9,000 households and approximately 31,600 residents. This growth is to occur in stages and result in a small, yet relatively dense, portion of Lake Elmo bearing most of the population growth, thereby preserving large sections of Lake Elmo as permanent rural areas. In contrast, Lake Elmo plans to develop at a moderate density, which will exhaust its land supply by 2020 at a population of 12,500 residents. Lake Elmo's comprehensive plan ignores the Council's desired density levels and fails to preserve land for future development. Finally, Lake Elmo does not plan to utilize the regional wastewater interceptor proposed for the Lake Elmo vicinity. Instead, Lake Elmo plans to expand usage of individual sewer sys-

---

9. Lake Elmo's city planner admitted as much when he testified that the two plans were "180 degrees" apart.

tems in direct contradiction of the WRMPP. For the foregoing reasons, we hold that there is a preponderance of evidence supporting the conclusion that Lake Elmo's comprehensive plan may contain a substantial departure from the Council's system plans.

The record further supports, by a preponderance of the evidence, the finding that Lake Elmo's comprehensive plan may have a substantial *impact* on the Council's system plans. *See* Minn.Stat. § 473.175, subd. 1. Specifically, Lake Elmo's limited population would cause inefficient underutilization of existing and planned transportation and sewer infrastructure. The close proximity of Lake Elmo to St. Paul, the availability of principal arterial roadways adjacent to Lake Elmo, the potential for transit services to Lake Elmo, and the availability of cost-effective wastewater treatment services, all point to Lake Elmo's suitability to absorb the inevitable population growth facing the metropolitan area. According to the 1996 Regional Blueprint, by 2020, the metropolitan area must accommodate 330,000 new households and 650,000 new residents. Of this new growth, the Regional Blueprint predicts that 110,000 new households will settle in the east metropolitan area, of which Lake Elmo is a part.

If Lake Elmo does not accept its fair share of metropolitan population growth, this population growth will likely go elsewhere. This, according to the testimony of multiple witnesses, will increase the cost of providing sewer and transportation infrastructure. Evidence showed that Lake Elmo's neighbors have shouldered a far greater population burden than Lake

Elmo itself. From 1990–2000, Lake Elmo's population grew by 16.3 percent. In the same time period, nearby communities such as, Oakdale, Cottage Grove, and Woodbury, grew by 45, 33, and 131 percent respectively. Moreover, an additional $10 million to $40 million would be required if the Council were to build the proposed Lake Elmo wastewater interceptor elsewhere in the metropolitan area. According to an analysis conducted by Bryce Pickart of the Council, providing a sewer interceptor similar to the proposed Lake Elmo interceptor would cost an additional $10 million if located in the Mahtomedi, Grant, and Dellwood area; $12 million more if built in the Hugo, Lino Lakes, and Forest Lake area; and, $27–$40 million more if built in the Blaine, Ham Lake, Andover, and Ramsey area. Finally, Natalio Diaz testified that Lake Elmo is situated a short distance from St. Paul and is served by three major highways—Interstate 94, Interstate 694, and Highway 36—which currently have the capacity for additional traffic.[10]

The foregoing evidence supports the Council's decision that Lake Elmo's comprehensive plan may have a substantial impact on the metropolitan regional system plans. The current and planned regional wastewater treatment and transportation infrastructure can serve Lake Elmo and its projected growth through 2040. If Lake Elmo does not grow in the manner prescribed by the Council in Resolution 2003–10, the "coordinated, orderly and economic development" of the metropolitan area will be adversely effected. Therefore, we hold that, by a preponderance of

10. The record reflects that the average daily traffic on Interstate 94 near Lake Elmo is among the lowest volume of similar six lane roadways in the metropolitan area. That portion of Interstate 94 carries 79,000 vehicles a day, whereas Interstate 35W carries 171,000 cars per day north of Highway 62 and Interstate 394 carries 134,000 cars per day west of Highway 100. Further, a $55 million expansion project is currently planned for a segment of Interstate 94, which connects Lake Elmo to St. Paul.

the evidence, Lake Elmo's comprehensive plan may have both a substantial impact on and a constitute substantial departure from the Council's system plans.

## IV.

 Finally, Lake Elmo argues that Resolution 2003–10, which requires Lake Elmo to accommodate the number of sewered households identified in the WRMPP, creates a de facto obligation to build a "new sewer system," a directive prohibited by Minn.Stat. § 473.871 (2002). Lake Elmo bases its argument on section 473.871, which states that "the council shall have no authority under this chapter to require a local governmental unit to construct a new sewer system."

Minnesota Statutes § 473.871, however, does not stand alone. Section § 115.01, subd. 18 (2002) defines "sewer system" as:

pipelines or conduits, pumping stations, and force mains, and all other constructions, devices, and appliances appurtenant thereto, used for conducting sewage or industrial waste or other wastes to a *point of ultimate disposal.*

(Emphasis added.) In order for a collection of pipes, pumps, and mains to constitute a sewer system, it must carry the wastewater "to a point of ultimate disposal." *Id.* Though the Council requires Lake Elmo to link to the metropolitan sewer system, it does not require Lake Elmo to transport sewage to the ultimate point of disposal, the Metropolitan Wastewater Treatment Plant located in St. Paul, Minnesota. *See* Minn.Stat. § 473.515, subd. 3 (2002). Therefore, although it is a critical part of the regional plan, Lake Elmo's obligation to connect to the regional wastewater interceptor falls short of what constitutes a complete sewer system, both in terms of the statute and common understanding. *See* Minn.Stat. § 115.01, subd. 18.

Further, and importantly, in 1975 the legislature also passed into law Minn.Stat. § 473.515, subd. 3 (2002), which provides in relevant part that:

The council may require any person or local government unit in the metropolitan area to provide for the discharge of its sewage, directly or indirectly, into the metropolitan disposal system, or to connect any disposal system or part thereof with the metropolitan disposal system wherever reasonable opportunity therefor [sic] is provided; * * *.

This subdivision expressly empowers the Council to require cities to connect their sewer systems to the metropolitan disposal system.

Harmonizing the three statutes and recognizing the Council's responsibility for "long-range comprehensive" planning for the metropolitan area, we hold that the Council has the right to require Lake Elmo to connect to the regional sewer system and that such a requirement does not violate section 473.871. To interpret the statutes as Lake Elmo requests would cripple the Council's wastewater planning function. Without the power to require connection to the regional sewer system, the Council could not plan and build sewer infrastructure with the assurance that it would be cost-effectively utilized and coordinated with overall regional development. *See* Minn.Stat. § 473.851.

In summary, we hold that the Council possesses the statutory authority to require Lake Elmo to modify its comprehensive plan in the manner provided by Resolution 2003–10; a preponderance of the evidence demonstrates that Lake Elmo's comprehensive plan "may have a substantial impact on or contain a substantial departure from metropolitan system plans"; and that the Council has the authority to

require Lake Elmo to connect to the regional sewer system.

Affirmed.